IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA RICHTER,<br><br>　　　　　　Petitioner,<br><br>　vs.<br><br>RODNEY HICKMAN, et al.,<br><br>　　　　　　Respondents. | Case No. S-01-CV-0643-JKS, (*consolidated with*, S-01-CV-0963-JKS)<br><br><br>　　　　　O R D E R |

| |
|---|
| CHRISTIAN BRANSCOMBE,<br><br>　　　　　　Petitioner,<br><br>　vs.<br><br>ERNIE ROE, et al.,<br><br>　　　　　　Respondents. |

## INTRODUCTION

Joshua Richter petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Case No. S-01-cv-00643-JKS;  Docket Nos. 1 (Petition); 8 (Answer); 10 (Traverse). Christian Branscombe petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Case No. S-01-cv-00963-JKS; Docket Nos. 17 (Second Amended Petition); 27(Answer); 31 (Traverse).  Petitioners were jointly convicted by a jury of murder, attempted murder, and related charges in California state court.  Both Petitioners are serving life sentences.  Both Petitioners allege ineffective assistance of counsel and *Brady* violations.  Petitioner Richter additionally alleges denial of due process due to an erroneous jury instruction.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Procedural Background

On December 23, 1994, the Sacramento County District Attorney charged Joshua Richter and co-defendant, Christian Branscombe, with the murder of Patrick Klein, the attempted murder of Joshua Gunner Johnson, burglary, and robbery.  Clerk's Transcript on Appeal ("CT") 16–20.  Trial began on November 14, 1995.  *Id*. at 182.  On December 18, 1995, the jury found the petitioners guilty as charged.  *Id*. at 318–25.  Petitioners were subsequently sentenced to life imprisonment without the possibility of parole for the murder plus various determinate state prison terms.  *Id*. at 389–95.

Both petitioners appealed the convictions.  *Id*. at 396, 400.  On March 20, 1998, the Court of Appeal of California upheld the convictions in a partially published opinion.  72 Cal. Rptr. 2d 773. On June 24, 1998, the Supreme Court of California denied petitioners' subsequent request for review.  98 Cal. Daily Op. Service 4955.

Both petitioners filed for writs of habeas corpus, both of which were denied without published opinions by the California Supreme Court on March 28, 2001.  *In re Joshua Richter on Habeas Corpus*, 2001 Cal. LEXIS 1946; *In re Christian Branscombe on Habeas Corpus*, 2001 Cal. LEXIS 1947.  Petitioners thereafter applied to the United States District Court for the Eastern District of California for writs of habeas corpus.  Because the issues presented in Petitioners' briefs were similar, on April 14, 2004, the Court issued an order consolidating both cases into Case No. S-01-cv-00643-JKS.  Docket No. 26.  Upon the Order of this Court, the deposition of trial counsel for both Petitioners was taken.  Docket No. 17.  All parties have submitted supplemental briefing. Docket Nos. 32 (Branscombe's Supplemental Brief); 33 (Richter's Supplemental Brief); 34 (Respondants' Supplemental Opposition); 37 (Branscombe's Supplemental Closing); 38 (Richter's Supplemental Reply).

### II.    Factual Background

On direct appeal, the California Court of Appeal summarized the facts at trial as follows:

> [O]n the morning of December 20, 1994, defendants attacked the home of a friend, a drug dealer, Joshua Johnson.  Johnson's home was used as a "party pad."  Defendants shot Johnson and Patrick Klein; Klein died.

ORDER

> They then stole Johnson's safe and about $6,000 in cash - - the proceeds
> from his daily drug sales.
>
> Johnson saw Branscombe shoot him but did not see Richter shooting.
> However, Klein was hit by two bullets, a .32 caliber and a .22 caliber.
> Branscombe had had a .32 earlier that evening.  Johnson's safe was found
> at Richter's house where Johnson occasionally kept it.

*People v. Branscombe*, C023375 at 2.[1]

As an extensive understanding of the investigation, trial, and divergent theories of the case are necessary for deciding the ineffective assistance of counsel claims, the facts pertaining to these items are appropriately developed at length herein.

### A.      Theories of the Case

Since all of the Petitioners' grounds for relief relate to the Petitioners' unsuccessful alternate theories of self-defense, it is necessary to understand at the outset the divergent theories presented at trial.  At trial, the jury heard two very different theories explaining the evidence.  Richter's brief summarizes it well:

> From the state, the jury heard (1) Richter and Branscombe shot Klein and Gunner
> in the course of a robbery and not in self-defense, (2) Klein was shot in cold-blood
> on the couch, and (3) Richter and Branscombe took [Johnson's] safe that night
> from Gunner's house to Richter's house.  From the defense, the jury heard (1)
> Branscombe entered the house to return property and money and was shot at,
> causing him to shoot in self-defense, (2) Klein was shot not on the couch while
> asleep but during a struggle in the bedroom, and (3) the safe was not moved to
> Richter's house that night, but had been there for several months.

Docket No. 33 at 5.  The State and defense presented these theories in opening statements on the fourth day of trial.  *See* Reporter's Transcript on Appeal ("RT"), on Augment.  Richter and Johnson both testified in support of their theories as to the events of December 19 and 20, 1994.

There was little conflict over the events preceding the shooting.  *See* Docket Nos. 33 at 5 - 6; 34 at 3 - 4; 32 at 2.  Johnson, a drug dealer, had been living for about a month at 4620 Fair Oaks Boulevard in Sacramento with Graham Sargent and Tony Hithe.  RT 467–68,  474, 480.

---

[1]  The portion of the opinion quoted was not certified for publication.  *See People v. Branscombe*, 72 Cal. Rptr. 2d 773, 774 (1998).  The unpublished portions are contained in the record of Branscombe's Petition prior to consolidation as Ex. 1 of Docket No. 27 (Respondent's Answer to Second Amended Petition).

ORDER

The home was described by Johnson as a place where people "hung out" and smoked marijuana. RT 473–74.   Johnson knew Branscombe through Hithe and considered Richter a really good friend.  RT 471–72.

On the evening of December 19, 1994, Branscombe and Richter were waiting in Johnson's driveway when Johnson returned to his home accompanied by Klein and Noah Zonca. RT 1070.  Johnson did not recognize the car Petitioners were sitting in so he jumped out of Zonca's car and approached them with his Mac-12 .380 handgun drawn.  RT 488–90.  Upon recognizing the Petitioners, Johnson put his gun away.  *Id*.  Zonca left and Johnson, Klein, Branscombe, and Richter went into the house together where they proceeded to hang out while Johnson, Klein, and Richter smoked marijuana.  RT 492–93, 1072–73.  While they were socializing, Branscombe cleaned a .32 caliber handgun, which he had recently acquired from either Hithe or Johnson.  RT 492–95, 1233.  Richter and Branscombe left Johnson's some time shortly after 2:30 a.m. on December 20, 1994.  RT 503–04, 1079–81.  Klein decided to stay the night.  RT 504.  Although agreement exists as to the events of the evening, the jury heard two very different versions of what happened later that morning when Richter and Branscombe returned to Johnson's house.

Johnson testified that after the Petitioners left, Klein laid down on the couch, and he went to sleep in the bedroom.  RT 504.  Awakened by noises sometime during the early morning, Johnson sat up and saw the Petitioners in his bedroom with his gun safe between them.  RT 507–09.  Johnson testified that "Branscombe had a gun in his hand, and he shot me."  RT 507. The shot knocked Johnson down and he remembered hearing voices and another gunshot.  RT 510.  When he heard the voices had moved to the front yard, Johnson got out of bed, turned on the light, and discovered that his Mac-12 and hip sack containing $6,000 in cash were missing. RT 510–13.  After locking the deadbolt on the front door, Johnson went to call 911 and noticed Klein laying on the couch bleeding.  RT 513–15.

Richter told a different story to the jury.  Richter testified that he and Branscombe left Johnson's home to go remove their belongings, along with Hithe's, from a trailer at a Christmas tree lot where all three had been working.  RT 1081–84.  To do this they dropped off Richter's

ORDER

girlfriend's car and picked up Richter's truck.  RT 1082.  After loading their belongings into the truck, they returned to Johnson's around 4:00 a.m. so Branscombe could return the .32 caliber handgun, and to see if Hithe was home, as they were planning to give him his belongings from the trailer and his wages from the tree lot.  RT 1085–87, 1233.

According to Richter's testimony, he stayed in the truck smoking a cigarette while Branscombe was let into the house by Klein.  RT 1086–87.  Shortly thereafter, Richter heard gunshots.  RT 1087.  When he realized what he had heard, Richter headed toward the house and heard yelling and more gunshots as he approached the front door.  RT 1087–89.  Upon entering the house, Richter smelled gunpowder and blood and saw Klein laying in the doorway to Johnson's bedroom.  RT 1089.  Richter went to the bedroom door, turned the light on, and saw Branscombe, "totally freaked out," standing in the middle of the room holding a handgun and Johnson laying on the bed.  RT 1089–91.  According to Richter, Branscombe yelled "[t]hey tried to kill me, that they - - they fired."  RT 1090.  Branscombe picked up Johnson's Mac-12 from the floor and told Richter they had tried to shoot him with it.  RT 1091.  Branscombe then ran outside leaving Richter in Johnson's bedroom.  RT 1091.  When Richter heard Branscombe trying to start the truck he panicked and ran back outside.  RT 1091–92.  Richter got into the driver's seat and he and Branscombe left together.  RT 1092–93.

**B.     Investigation**

The State's case going into trial bears directly upon the reasonableness of strategic decisions made by Petitioners' counsel.  In order to eliminate the prejudice of 20/20 hindsight as much as possible, it is important to understand the context in which pretrial decisions were made. The facts of the State's investigation are therefore examined at length.

Pursuant to a 911 call made by Johnson, Deputies Wright and Larson were dispatched to the scene around 5:00 a.m. on December 20, 1994.  RT 27.  Upon arriving at the scene at 5:06 a.m., Wright contacted a hysterical and bloody Johnson.  RT 27–31.  When Wright entered the house he saw Klein, fully dressed and laying on top of a sleeping bag on the couch in the living room.  RT 32, 42.  Although Wright detected no signs of life in Klein, paramedics later found a cardiac rhythm and transported Klein to the UC Davis Medical Center ("UCDMC")

ORDER

where he died.  RT 33, 35, 44, 62.  After calming Johnson down, Wright took a brief statement from him, during which he noticed that Johnson was not just bloody, he had also been shot in the cheek and the shoulder.  RT 36–38.  Johnson was taken to the UCDMC where Officer Ferry took a further statement in which Johnson implicated Richter and Branscombe .  RT 62, 922, 930–31.  Johnson told Ferry that Branscombe had shot him, and that he and Richter had taken his gun safe and about $6,000 in cash.  RT 930–31.

Homicide detectives Maulsby and Bell did an initial walk-through around 7:45 a.m. and finished processing the crime scene by 10:10 a.m.  RT 94–95.  It was apparent to Bell that the forensic evidence was consistent with the statement made by Johnson and that a detailed blood splatter analysis would not be necessary.  RT 203–04.  A spent .32 casing and a spent CCI brand .22 casing were found in the living room near the couch where Klein was found by the deputies.  RT 117–18, 769.  Blood splatter on the armrest and a concentration of blood on the end of the couch where Klein's head was resting were present when the deputies arrived.  RT 119–20.  Two spent .32 casings were found in the bedroom where Johnson said he was shot.  RT 127–28.  Blood was found on the bed where Johnson said he was shot.  RT 125–26.  There were blood drops and transfers throughout the house, and a blood pool in the doorway of the bedroom that appeared to have been "foot stomped."  RT 109–10, 115–17, 119–20, 138–29.

By noon, the investigators had turned their investigation to a garage where Richter had been living.  RT 445.  In the garage they found Johnson's gun safe haphazardly laying on its back.  RT 423, 433–34, 447, 1179–80.  They also discovered two boxes of CCI brand .22 cartridges and a magazine loaded with live CCI Stinger .22 cartridges.  RT 425, 765.  The cartridges found in the magazine were the same type as the spent .22 casing found in the living room of Johnson's home.  RT 765, 769.

Richter and Branscombe were found and arrested the following afternoon on December 21, 1994.  RT 1114, 1125.  Later that evening, Richter led his attorney and Detective Bell to a very remote location where he and Branscombe had allegedly thrown Johnson's .380 caliber Mac-12 and Branscombe's .32 caliber handgun.  They did not locate either firearm, but Bell did find a $100 bill approximately twenty-five to fifty yards away from the area indicated by Richter.

ORDER

RT 454–56, 461–62.  Richter's attorney managed to find the Mac-12 the following day, but the weapons which fired the bullets striking Klein and Johnson were never recovered.  RT 1136–37.

Subsequent examination of the bullets, casings and cartridges recovered during autopsy and at Johnson's and Richter's respective homes further implicated Richter.  Robert Garbutt, a journeyman level criminalist for the Sacramento County Sheriff's Department, determined that the .22 caliber bullet removed from Klein was a CCI Stinger and had markings consistent with being fired from a High Standard Sport King.  RT 757–58, 769–70.  He also determined that the spent .22 casing found in the living room of Johnson's home had microscopic markings consistent with having been ejected from a High Standard Sport King.  RT 769–70.  Although the firearm that fired the .22 caliber bullet found in Klein was never recovered, the magazine loaded with CCI Stingers found in Richter's garage was identical in size and shape to High Standard magazines designed specifically for a Sport King.  RT 759–63.  In fact, the magazine found in Richter's garage was inserted by Garbutt into a laboratory exemplar High Standard Sport King and successfully fired.  RT 761.

Although the State processed latent fingerprints and conducted extensive analysis of the ballistic evidence, the blood evidence at the crime scene does not appear to have been emphasized during the State's investigation.  Detective Bell did not conduct a blood splatter analysis while he was processing the scene, or at any time before trial.  RT 158, 203–04.  The State collected only 6 blood samples from the scene.  RT 259–62.  The State did not test the blood prior to trial.  RT 886–888.  The State had not even drawn blood from Johnson for comparative analysis before trial.  RT 855, 886.  Given the forensic evidence and its consistency with the surviving victim's statement, the State merely collected a few blood samples and documented the scene with video and photographs.  *See* RT 203–04.

**C.   Trial**

Trial began on November 14, 1995.  CT at 182.  Petitioner Richter was represented by Mark Axup ("Axup").  RT at 3.  Petitioner Branscombe was represented by Tom Dixon ("Dixon").  *Id*.  Steve Grippi ("Grippi") prosecuted the case for the State.  *Id*.  Grippi and Axup outlined their theories of the case through their opening statements during the morning session of

ORDER

the fourth day of the trial.  *See* RT on Augment.  Axup told the jury that the physical evidence would support the defense's theory of the case.  RT on Augment at 26–27.  Axup told the jury that they would find Johnson's story inconsistent and incredible.  RT on Augment at 28–31. Axup told the jury that he believed that there would be testimony from experts and lay witnesses which would support certain elements of the defense's theory of the case.  RT on Augment at 32–33.

Grippi, having heard Axup's self-defense theory during opening statements, scrambled to plug the evidentiary holes it appeared Axup was moving to exploit.  Grippi called Detective Bell during the lunch recess of the fourth day to ask him to analyze the blood evidence with regard to Axup's theory.  RT 158.  Just a few hours later, Bell was on the stand, not just as the detective who processed the scene, but certified as an expert in blood spatter.  RT 103–04.  On the fifth day of trial, November 21, 1995, Grippi sent Investigator Maloney back to Johnson's home to look for any additional bullet holes in Johnson's bedroom which might support the self defense theory.  RT 848.  On the same day, Grippi had Johnson give a blood sample and sent the blood evidence to be tested and analyzed.  RT 855–56, 886–88.  On day nine of trial, Grippi put Maloney and an expert in serology on the stand to close the evidentiary holes exploited by Axup. RT 818–921.

Axup began presenting the defense's case on the ninth day of trial, November 29, 2005. RT  922.  Axup called seven witnesses, including Richter.  RT at vii–ix.  None of the witnesses presented by Axup were experts.  Docket 33, Exhibit M, Axup's Deposition ("AM"), at 26–27. The defense rested on day thirteen.  RT at 1271.  Grippi presented rebuttal witnesses on day fourteen.  RT at x.  Closing arguments were heard on days fifteen and sixteen.  RT at xi.  The jury was instructed on day seventeen and returned with a verdict on day nineteen of trial, December 18, 1995.  RT at xi.

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act ("AEDPA") permits a federal court to grant relief in habeas corpus petitions only if the state court's decision:  (1) was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the

ORDER

Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)–(2). "The first prong applies both to questions of law and to mixed questions of law and fact, while the second prong applies to decisions based on factual determinations." *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003) (citations omitted). A state court's determination is "'contrary to' federal law if the state court (1) 'applies a rule that contradicts the governing law' set forth in Supreme Court case authority or (2) applies controlling law to a set of facts that are 'materially indistinguishable' from a Supreme Court decision but nevertheless reaches a different result." *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1169 (9th Cir. 2003) (citing and quoting *Lockyer v. Andrade*, 123 S.Ct. 1166, 1173 (2003)). A state court's decision is an "unreasonable application" of federal law if it is "objectively unreasonable," which "requires the state court decision to be more than incorrect or erroneous." *Lockyer*, 123 S.Ct. at 1174.

Where a state court fails to provide any reasoning for its decision, as where it rejects the constitutional claim in a summary fashion without explanation, the process of determining "objective" unreasonableness is more complicated because there is no state court decision to analyze. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Where a state court rejects a claim without any analysis, the district court must "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Id*. at 853. The independent review is the "only method" by which a district court can "determine whether a silent state court decision is objectively unreasonable." *Id*.

I.   ***Richter v. Hickman*, S-01-cv-00643-JKS**

Petitioner Richter alleges that a writ must issue because: (1) he received ineffective assistance of counsel when his attorney, Axup, failed to introduce evidence at trial in support of the defense's theory; (2) his due process rights were violated when the prosecution suppressed evidence in violation of *Brady*; and (3) his due process and jury trial rights were violated when the trial court misinstructed the jury on the felony murder rule. Docket No. 33 at 26, 36, 41.

ORDER

A.        **Ineffective Assistance of Counsel Claim**

The Constitution guarantees the right to a fair trial through the Due Process Clauses of the Fifth and Fourteenth Amendments and defines the basic elements of a fair trial in the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 684–85 (1984). A fair trial, in essence, "is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id*. at 685. Because the right to counsel plays such a crucial role in the adversarial system, it is not enough that a lawyer merely be present at courtroom proceedings; a lawyer must, at the very least, demonstrate a basic level of competency. *Id*. This conclusion follows directly from the purpose of the Sixth Amendment, which "is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id*. at 691–92.

To make a successful Sixth Amendment ineffective counsel challenge to a state court judgment, a petitioner must demonstrate that (1) his trial counsel's performance fell below an objective standard of reasonableness, and (2) but for these deficiencies, a reasonable probability exists that the outcome of the trial would have been more favorable to him. *Id*. at 687–88, 691–92. In reviewing counsel's performance, this Court must "strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that [counsel] exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689; *Weygandt v. Ducharme*, 774 F.2d 1491, 1493 (9th Cir. 1985)). As the Supreme Court explained in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of the counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 694–95 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). In light of *Strickland*, the Ninth Circuit has charted a course of contemporary assessment, where an attorney's actions must be examined according to what was known and reasonable at the time.

ORDER

*Deutscher v. Whitley*, 884 F.2d 1152, 1159 (9th Cir.1989) (vacated on other grounds, *Angelone v. Deutscher*, 500 U.S. 901 (1991)).

### 1.    Objective Standard of Reasonableness

Richter asserts that Axup's promise to deliver during opening statements and his subsequent failure to develop and put on certain evidence fell below the objective standard of reasonableness.  Docket No. 33 at 26–33.  Specifically, Richter points to Axup's failure to develop and/or present evidence in the areas of: (1) serology and blood splatter; (2) ballistics; and, (3) the location of Johnson's safe during the shooting.  Docket No. 33 at 14–20.  Richter has submitted the declarations of witnesses who would have been available to testify during trial.

### i.    Serology and Blood Splatter

As to serology and blood splatter, Richter provides declarations from:  (1) Dr. John Thornton, a forensic scientist; (2) Dr. Paul Herrmann, a medical doctor and forensic pathologist; (3) Ken Moses, a forensic criminologist; and (4) Brian Wraxall, a forensic serologist.  Docket No. 33, Exs. E, F, G, L.  Thorton and Wraxall, after reviewing the blood type evidence in this case, would have testified, contrary to the State's serology expert, that Klein could not be reliably excluded as a contributor to the pool of blood found in the doorway of Johnson's bedroom.  *Id*. at E; L.  Herrmann, after examining applicable photographs, parts of the transcript from trial, and the autopsy report, would have testified that the State's theory that Johnson deposited the pool of blood in his doorway is scientifically unreliable.  *Id*. at F.  Moses, after reviewing applicable photos, parts of the transcript, and the autopsy report, would have testified that pool of blood in the doorway of Johnson's bedroom could not have been made by someone standing and dripping blood.  *Id*. at G.  Richter asserts that Axup should have found these experts to support the defense's theory that Klein was shot in the doorway during a struggle.

After accounting for the distorting effect of hindsight, the Court is not persuaded that Axup's failure to produce this evidence fell below the objective standard of reasonableness.  Axup's pretrial investigation and study led him to the belief that the trial would be primarily a credibility case.  AD at 51.  The State implicitly agreed with Axup by not preparing a blood spatter analysis or even testing any of the blood samples taken from the crime scene.  Given the

ORDER

lack of blood evidence developed by the State prior to trial, Axup's failure to find and produce the expert testimony at issue does not fall below the standard.

Axup's failure to find and call these experts after he was surprised at trial by the sudden presentation of expert blood spatter and serology testimony was also reasonable. Axup did what he could under the circumstances. Axup objected to Bell being called as an expert witness, moving to exclude the testimony and/or for a preliminary facts hearing; both motions were denied. AD at 152. Axup objected to the surprise expert testimony on serology and requested more time to prepare; this motion was denied as well. AD at 35, 48, 77. Axup spent the night studying serology and the State's expert's report at the library to prepare for cross-examination. AD at 78–82. If Axup had been given more notice of the State's expert testimony, this question would have been closer, but given the way events unfolded, the Court is persuaded that Axup's actions were reasonable.

### ii.     Ballistics

Part of the defense's self defense theory was that Johnson's Mac-12 jammed when Johnson fired it at Branscombe. Richter testified that as they drove to a remote area after the shooting, Branscombe examined Johnson's Mac-12 and discovered a spent casing was jammed in the receiver. RT 1098–99. A spent .380 casing was found in Richter's truck when he was arrested. RT 385. After Axup recovered the Mac-12, the State's criminalist, Robert Garbutt, examined it and discovered that someone had removed the circlip retainer and ground and polished part of the receiver in an attempt to make it fully automatic. RT 784–86. On cross-examination, Garbutt testified that the alterations could potentially cause the weapon to misfire, but that he did not know if it would cause a failure to eject. RT 784–85. Garbutt also testified that he had test-fired the Mac-12 three times and it had not failed to fire or to eject the spent casing properly. RT 785–86. Axup spoke with two weapon's experts before trial about the likelihood of the altered Mac-12 jamming, but did not call his own expert. AD 27–32.

Richter now submits the declaration of Daniel Joseph, a firearms and ballistics expert. Docket No. 33, Ex. K. After examining Johnson's Mac-12, Joseph states that he would have testified that the alterations made to the weapon could have caused a failure to eject. *Id*. Richter

ORDER

asserts that Axup's failure to put a firearms expert on the stand fell below the standard of objective reasonableness.

The Court is not persuaded that Axup's decision not to augment Garbutt's testimony fell below the standard of reasonableness.   Axup claimed in his deposition that he believed the Mac-12's propensity to jamming had been established during the cross examination of Garbutt.  AD 14–15, 164–65.   Axup felt at the time that Garbutt's testimony was enough in conjunction with the spent .380 casing found in Richter's truck.  AD 62.   Axup was mistaken about what the defense had actually gotten from Garbutt on cross-examination, but his mistake was reasonable.  The differences between a misfire and a failure to eject are technical and could easily be confused during the examination of an expert.

Richter alleges Axup made a second blunder in the area of ballistics.  The defense's theory that the Mac-12 jammed would have been bolstered if a bullet hole consistent with being made by a .380 caliber bullet had been found in Johnson's house.  No such bullet holes were found prior to trial.  *See* RT 840–48.  Axup in his opening statement alleged that there was a .22 caliber bullet hole in the floor of Johnson's room.  RT on Augment at 37.  The next day, November 21, 1995, Grippi sent Investigator Maloney ("Maloney") back to Johnson's home to look for any additional bullet holes in Johnson's bedroom which might support the self defense theory.  RT 848.  Maloney found a bullet hole in the floor that he believed was consistent with a .22 caliber bullet.  RT 848.  He photographed the hole with a measuring device next to it for reference.  RT 852–53.  In an unsuccessful attempt to find the bullet that made the hole, Maloney cut out the section of floorboard that had the bullet hole in it.  RT 849.  The section of floorboard fell into the crawl space and is now the subject of Petitioners' *Brady* claim.  Here however, Richter alleges his counsel rendered ineffective assistance by failing to investigate the bullet hole further.

Richter now provides the declarations of Dale Richter, the Petitioner's father, and James Aiello, a ballistics expert.  Docket No. 33, Exs. A; C.  After trial, Dale Richter went into the crawlspace beneath Johnson's room and located the section of floorboard cut out by Maloney. *Id.* at A.  Dale gave the section of floorboard to Axup.  *Id.*  Axup had the section of floorboard

ORDER

examined by Aiello.  *Id*. at C.  Aiello, after examining the bullet hole and conducting a comparative analysis, concludes that the bullet hole was made by a .380 caliber bullet.  *Id*.

The Court is not persuaded that Axup's decision to not collect the floorboard before or during trial fell below the standard.  The investigators for both the State and the defense believed the bullet hole was made by a .22 caliber bullet.  RT 848; RT on Augment at 37.  Axup had no reason to believe the hole was anything but what the investigators had found.  Although it turns out that both investigators were mistaken, their mutual mistake does not make Axup's reliance unreasonable at the time.

### iii.      Location of the Safe

Axup told the jury in his opening statement that he believed Stephanie Edwards and Linda Stewart would give testimony indicating that Johnson's safe was in Richter's garage before the shooting.  RT on Augment at 32.  Axup put Stephanie Edwards on the stand and she testified that she saw the safe in the garage on December 19, 1994.  RT 1018–19.  Although Johnson admitted that he occasionally kept the safe in Richter's garage, he testified that he and a friend had moved the safe to Johnson's home some time around the end of November or beginning of December.  RT 483–84, 485.  Scott Brown corroborated Johnson's story, testifying he helped Johnson move the safe during that time period.  RT 1304.

Richter now presents the declarations of Madalyn Edwards, Richter's girlfriend's sister, and Shane Westburg and Linda Stewart, Richter's former housemates.  Docket No. 33, Exs. H, I, J.  Madalyn declares that she would have testified that the safe was still in Richter's garage during her visits to the house from December 3 through 10.  *Id*. at H.  Both Westburg and Stewart declare that they would have testified that their dogs would have woken them up if Richter and Branscombe had brought the safe to Richter's house in the early morning of December 20, 1994.  *Id*. at I; J.  Richter asserts that Axup's decision to not call these witnesses after telling the jury he believed they would testify fell below the objective reasonable standard.

The Court is not persuaded Axup's decision falls below the standard of reasonable assistance.  First, Axup states that he made a tactical choice not to call these particular witnesses because he felt their testimony on balance would have been detrimental to the defense.  AD

ORDER

92–97, 147–48.  Second, the State and the defense presented two witnesses each that testified as to the location of the safe prior the shooting.  The jury obviously found the State's witnesses more credible.  Given the strong presumption of reasonable assistance from *Strickland*, and the defense's presentation of testimony as to the location of the safe, Axup's tactical decision to not call the witnesses in question was reasonable.

### 2.	Prejudice

To make a successful Sixth Amendment ineffective counsel challenge to a state court judgment, a petitioner must also show that but for the deficient counsel, a reasonable probability exists that the outcome of the trial would have been more favorable to him.  *Strickland*, 466 U.S. at 687.  The Ninth Circuit has held that "it is unnecessary to consider the prejudice prong of *Strickland* if the petitioner cannot even establish incompetence under the first prong."  *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995)).  Because Richter has not established incompetence under the first prong, the Court will not examine the second.

### B.	Brady Claim

Richter makes the argument in both his petition and supplemental petition, that he was denied due process when the prosecution suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Docket Nos. 1, at 23–31; 33, at 36–39.  The Court has previously indicated, at length, its view of this argument.  Docket No. 17 (Order dated November 17, 2003).  Nothing presented in Petitioner's supplemental briefing persuades the Court from its initial views regarding this claim.  This claim fails.

### C.	Jury Instruction Claim

In this Court's November 17, 2003 Order, this issue was addressed as follows:

> It is not clear that this issue presents a problem of due process cognizable in federal court.  It appears that the California Court of Appeals found no state error.  If this is true, then Richter cannot contend that the process violated state law.  He must prove there was an independent violation of federal constitutional law since this Court has no jurisdiction to review decisions of state courts applying state law.

Docket No. 17 at 4.

The jury sent the trial court a note during deliberations, which read as follows:

ORDER

Clarification of Instructions:

If a defendant is found guilty of Robbery & Burglary in the first degree, it is our understanding that this necessarily lead to a guilty verdict of murder in the first degree if a human being is killed during the commission of the above Robbery and Burglary.

Also, if a defendant is found to have aided & abetted in the above Robbery/Burglary is he guilty of all charges (or can you find him guilty of lesser charges) as found for the other defendant.

CT at 316.  The trial court's clerk's minute order reflects that "After conferring with the all [sic] counsel, the court sent the following reply: 'Yes. (To the first question) The "felony murder rule" applies only to murder, not attempted murder.'" *Id.*

Since any instruction error that may have occurred happened in state court, it is a given that this Court cannot grant habeas corpus based upon state law errors.  *See Estelle v. McGuire*, 502 U.S. 62 (1991).  When it comes to instructional errors, the Supreme Court has made it clear that:

The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction . . . we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."

*Id.* at 72 (citations and footnote omitted).

In this case, it has not been established that the instruction, or its clarification, was so defective that the entire trial was "infected."  As the California Court of Appeal stated, ". . . the phrasing of the jury note indicates it was confused about application of the felony-murder rule . . . . [. . .]  The trial court's answer was not incorrect, at worst it did not fully state the rules of aider liability *apart from the felony-murder rule*."  *People v. Branscombe*, 72 Cal.Rptr.2d 773, 781 (1998) (emphasis in original).

In addition, when viewing the instruction and clarification as a whole, as required, it appears that the jury was given a special circumstance instruction and, in answering it in the affirmative, found that Richter's involvement in the robbery of Johnson, whether as a direct perpetrator, or as an aider and abettor, commenced before or during the killing of Patrick Klein.

ORDER

CT at 266-268; 318.  This precludes any reasonable likelihood that the jury may have applied the instruction, and subsequent ambiguous clarification, in a way that violates the Constitution.

Therefore, because the State court's denial of habeas relief is neither "contrary to," nor involved "an unreasonable application of clearly established federal law," under 28 U.S.C. § 2254, Richter is not entitled to relief on this ground.

## II.    *Branscombe v. Roe*, S-01-0963 (JKS)

Petitioner Branscombe asserts that a writ must issue because:  (1) he was effectively unrepresented at trial; (2) his counsel, Tom Dixon ("Dixon") failed to develop and present expert testimony on critical forensic issues; and (3) his due process rights were violated when the prosecution suppressed evidence in violation of *Brady*.  Docket No. 32 at 16, 23, 31.

### A.    Constructive Denial of Counsel Claim

Branscombe alleges that he was constructively denied counsel because Dixon altogether failed to investigate or prepare for trial.  Docket No. 32 at 17.  Axup gave a scathing review of Dixon's preparation for and performance at trial.  Branscombe's memorandum summarizes Axup's testimony:

> Dixon did not participate in investigation or pre-trial preparation, failed to communicate pre-trial about matters of common concern, failed to consult with co-defendant's counsel regarding the advisability of joint trial or the need for severance, had not read all the police reports on the day set for jury selection, conducted jury selection without having reviewed the jury questionnaires, was unfamiliar with the evidence and witnesses as the trial began, conducted cross-examination by the seat of his pants, subpoenaed no witnesses of his own, and refused to assist in research related to mid-trial developments.  Mr. Axup's testimony strongly suggests that Mr. Dixon took the case in order to earn a final $20,000 before losing his ability to practice law, and did little to earn that fee other than show up at trial to try to "razzle dazzle" the jury.

Docket No. 32 at 17–18 (citations omitted).  Although Dixon was sure at his deposition that he must have prepared for the trial, he had no specific recollection of doing so.  *See, e.g.,* Deposition of Dixon at 20–30.

Branscombe argues that his current claim has not been "adjudicated on the merits," because it is now bolstered by the depositions of trial counsel and not merely the trial record. Docket No. 37 at 3.  On direct appeal, the Court of Appeal of California rejected Branscombe's

ORDER

constructive denial of counsel argument.  *People v. Branscombe*, 72 Cal. Rptr. 2d 773, 781 (1998).  The appellate court recognized that Dixon made no opening statement and called no witnesses, but found that the face of the record indicated that Dixon had tested the prosecution's case providing an "active defense."  *Id.*  "Trial counsel (1) successfully moved to exclude evidence, (2) successfully moved to suppress statements, (3) made numerous objections, (4) cross-examined most of the witnesses, (5) moved successfully to strike testimony, and (6) had a witness perform a demonstration."  *Id.*

The Supreme Court has "identified three situations implicating the right to counsel that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'"  *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 658–59 (1984)).  The three situations are:  (1) when there has been a complete denial of counsel at some critical stage of the trial; (2) where "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;'" and (3) "where counsel is called upon to render assistance under circumstances where competent counsel very likely could not."  *Id.* at 695–96 (citations omitted).  In these situations, prejudice to the defense is found per se.  *Cronic*, 466 U.S. at 658–59.

Branscombe argues that Dixon's conduct falls into the second exception to *Cronic*, and that *Cronic* is the proper test for his claim.  Docket No. 32 at 16–23.  Branscombe's argument is not that Dixon failed to oppose the prosecution throughout some portion of the trial, but that Dixon's opposition wasn't meaningful because Dixon completely failed to investigate and prepare for trial.  Although neither the Supreme Court or the Ninth Circuit have extended *Cronic* to situations where the defense counsel failed to investigate and prepare for trial, Branscombe argues that it was unreasonable for the state court to not do so in these circumstances.  Docket No. 37 at 7.

The Court is not persuaded that the California Supreme Court's failure to extend *Cronic* was unreasonable.  First, the United States Supreme Court has found that the failure to test the prosecution's case must be complete:  "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the

ORDER

attorney's failure must be complete.  We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.'"  *Bell v. Cone*, 535 U.S. 685, 697 (2002) (quoting *Cronic*, 466 U.S. at 659).  Branscombe's attempt to distinguish *Cone* is inapposite. Axup's testimony indicates that Dixon was not as prepared as he should have been, but it does not show that Dixon's failure was complete.  According to Axup, they did meet prior to trial to discuss theories of defense and Dixon was still reading the police reports.  AD 99–100.  This may be deficient preparation, but it is not the complete absence of preparation.  Dixon's cross-examinations also reveal some degree of preparation.  *See e.g.* Dixon's cross examination of Robert Garbutt, RT 783–87.  Finally, the Ninth Circuit's use of the *Strickland* standard for claims of failure to investigate demonstrates the appropriateness of the *Strickland* standard in this situation.  *See e.g. Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

Therefore, because the state appellate court's ruling on Branscombe's constructive denial of counsel claim is neither contrary to, nor an unreasonable application of, controlling federal law, Branscombe's claim that his Sixth Amendment rights were denied on the basis of constructive denial of counsel must be rejected.

### B.  Ineffective Assistance of Counsel Claim

In addition to the arguments presented by Richter above, Branscombe alleges that his Sixth Amendment right to counsel was violated because his defense counsel faced an impending California Bar suspension.  Docket Nos. 17 at 2-13; 32 at 16-23.

As noted earlier, to make a successful Sixth Amendment ineffective counsel challenge to a state court judgment, a petitioner must normally demonstrate that (1) his trial counsel's performance fell below an objective standard of reasonableness, and (2) but for these deficiencies, a reasonable probability exists that the outcome of the trial would have been more favorable to him.  *Strickland* 466 U.S. at 687–88, 691–92.  Having dealt with Branscombe's argument to apply a *Cronic* standard to his claim above, the Court will apply the *Strickland* standard to Branscombe's related claims of ineffective assistance here.

ORDER

**1. Dixon's pending California Bar suspension**

Branscombe asks the Court to take judicial notice of Thomas Dixon's complete State Bar disciplinary records.  Docket 32 at 14.  The records include orders of the California Supreme Court and official records of the California State Bar Court.  *Id.* at Exhibit 2.   The records are proffered for their relevance to Dixon's credibility and his competence.  Docket 32 at 14-16. Courts may take judicial notice of adjudicative facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

It is true that counsel's disbarment or suspension, either before or during trial, may raise doubts about his competence.  However, the Ninth Circuit has observed that the actual effects of any such doubts are appropriately addressed by the guidelines given in *Strickland* for ineffective assistance of counsel claims.  *See United States v. Mouzin*, 785 F. 2d 682 (9th Cir. 1986); *United States v. Hoffman*, 733 F.2d 596 (9th Cir. 1984).  Thus, the fact that Branscombe's lawyer was facing a suspension at the conclusion of Branscombe's trial may be immaterial to the ineffective assistance claim.

This Court will judicially notice the offered exhibit only for the proposition that Mr. Dixon was facing suspension from the practice of law in January 1995.  In light of Dixon's pending suspension from the California Bar, Branscombe must identify "actual errors and omissions by counsel that a conscientious advocate would not have made," and show that he suffered prejudice from those errors in order to prevail on this aspect of his ineffective assistance claim.  *Mouzin* at 696; *Strickland*, 466 U.S. at 687.

**a.  Objective Standard of Reasonablness**

Under *Strickland,* petitioners face a strong presumption that a attorney's trial strategy and demeanor at trial is objectively reasonably.  *Id.* at 694–695.  In the instance case, this Court ordered  Branscombe's trial counsel deposed.  Docket No. 34**.**  Nothing existed in the record originally provided by the parties "in which Branscombe's trial counsel address[ed] each of Branscombe's allegations regarding his (trial counsel's) alleged ineffectiveness.  Nor [did] trial counsel explain his actions or, in some cases, his inaction."  *Id.*  Dixon's lack of memory during

ORDER

C:\Documents and Settings\MKrueger\Local Settings\Temp\notes101AA1\S01-0643.005.wpd

his deposition, however, places the Court in the awkward position of evaluating Dixon's behavior based upon the testimony of Richter's trial counsel, Mark Axup, and the declaration of Mr. Branscombe's first retained trial lawyer, Mr. Dorfman.  Docket Nos. 32 (Deposition of Thomas Dixon; Declaration of Dorfman, at Exhibit 1)**;** 33 (Deposition of Mark Axup, at Exhibit M).

Branscombe makes the following arguments:

First, Dixon unethically breached Mr. Branscombe's preexisting attorney-client relationship with Mr. Dorfman.  He then arranged to take an entire $20,000 inheritance to try a case he had no reasonable possibility of preparing.  He ignored professional advice to seek a competency evaluation, because the resulting delay was contrary to his financial interest in having the trial over before his suspension went into effect.  He declined to seek continuances for further investigation which would have been beneficial to the defense, also because delay was contrary to his financial interest.

Docket No. 32 at 21–22 (citations omitted).

Additionally, no agreement existed between Axup and Dixon about a division of labor. AD 98, 101.  And, although Dixon unilaterally told Axup that he was "comfortable" leaving witness interviews up to him, Axup had never agreed to single-handedly conduct a joint investigation.  AD 102.

It is conceivable to this Court that Dixon's representation of Branscombe, under the circumstances of his pending suspension, full trial schedule, and apparent financial constraints, may have fallen beneath an objective standard of reasonableness.

### b.    Prejudice

Nevertheless, Branscombe still must demonstrate that any objectively unreasonable behavior by his counsel at trial was prejudicial to him as well.  The question becomes whether, absent the errors, there is a reasonable probability that the factfinder would have had a reasonable doubt as to guilt.  *Strickland*, at 695.  In other words, Branscombe must show that the decision reached would have likely been different absent the errors.  *Id.* at 696.

The errors in question due to Dixon's pending bar suspension support the notion that Dixon was a lawyer facing a suspension from the practice of law.  Dixon's questionable nature of attaining Branscombe as a client, his seeming lack of preparation due to a full schedule, his refusal to ask for a continuance, his failure to collaborate with Richter's counsel, all these things

ORDER

Case 2:01-cv-00643-JKS   Document 39   Filed 03/24/06   Page 22 of 23

suggest with any certainty, is that Dixon was distracted before trial.  They do not demonstrate that the jury would have found differently for Branscombe at the conclusion of the trial. Branscombe has not shown prejudice by his trial counsel's pending bar suspension.

### 2.  Failure to present expert and lay testimony

In addition to his pending bar suspension, Branscombe argues that his counsel was constitutionally deficient in failing to develop and present expert testimony on critical forensic issues.  Docket 32 at 23.  Specifically, he claims Dixon failed to develop evidence regarding the jamming of the Mac-12 gun, and the state's serology and blood spatter evidence.  These are the same claims made by Richter above, and rejected by this Court.  For the reasons already stated, Branscombe's similar arguments will be similarly rejected.

### C.    Brady Claim

Likewise, this claim has been examined previously.  It was presented by Richter, with Branscombe merely joining Richter's argument.  Docket No. 32 at 31.  For the reasons stated above, this claim fails.

**IT IS THEREFORE ORDERED:**

Joshua Richter's petition for a writ of habeas corpus at **Docket Nos. 1** and **33** is **DENIED**.  Christian Branscombe's petition for a writ of habeas corpus at **Docket Nos. 17** and **32** is **DENIED.**

In addition, appeal may not be taken without a certificate of appealability from either this Court or from the Ninth Circuit Court of Appeals.  28 U.S.C. § 2253.  The standard for granting a certificate of appealability has been stated as follows: "Where a district court has rejected the constitutional claims on the merits . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *United States v. Zuno-Arce*, 339 F.3d 886, 888–89 (9th Cir. 2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Petitioners have made no such showing.  The trial court's alleged errors in jury instructions and admission of evidence do not violate due process and thus are not sufficient grounds to grant his petition.  Nor do Petitioners' claims of ineffective assistance of counsel establish a basis for habeas corpus relief.  The state court applied the correct United

ORDER

States Supreme Court standard and thus there was no violation of federal law.  The same is true of the state court's denial of a new trial.  For these reasons, this Court will not issue a certificate of appealability in this case.  Richter or Branscombe may seek a certificate of appealability directly from the Ninth Circuit Court of Appeals' motions panel.


        Dated at Anchorage, Alaska, this 24th day of March 2006.


                                            /s/ James K. Singleton, Jr.
                                            **JAMES K. SINGLETON, JR.**
                                            United States District Judge



ORDER

23